**2014-1281**

# United States Court of Appeals
# for the Federal Circuit

XPERTUNIVERSE INC.,

*Plaintiff-Appellant,*

*v.*

CISCO SYSTEMS, INC.,

*Defendant-Appellee.*

*Appeal from the United States District Court for the District of Delaware in No. 1:09-cv-00157-RGA, Judge Richard G. Andrews.*

## NON-CONFIDENTIAL BRIEF FOR DEFENDANT-APPELLEE

Brett M. Schuman
MORGAN, LEWIS & BOCKIUS LLP
One Market Street, Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

Kell M. Damsgaard
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Kathleen M. Sullivan
Cleland B. Welton II
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
kathleensullivan@quinnemanuel.com

Daniel H. Bromberg
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

*Counsel for Appellee Cisco Systems, Inc.*

MAY 22, 2014

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee Cisco Systems, Inc. certifies the following:

**1.     The full name of every party or amicus represented by me is:**

Cisco Systems, Inc.

**2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

N/A.

**3,     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

Cisco Systems, Inc. has no parent corporation, and no publicly held company owns 10 percent or more of Cisco Systems, Inc.'s stock.

**4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:**

QUINN EMANUEL URQUHART & SULLIVAN, LLP: Kathleen M. Sullivan, Daniel H. Bromberg, and Cleland B. Welton II.

MORGAN LEWIS & BOCKIUS LLP: Brett M. Schuman, Colm Connolly, Kell M. Damsgaard, John V. Gorman, Franklin Brockway Gowdy, Renee T. Lawson, Esther Ro, Ryan L. Scher, Dennis J. Sinclitico, Jr., and Rachel M. Walsh.

i

MORRIS, NICHOLS, ARSHT & TUNNELL LLP: Jack B. Blumenfeld, Rodger Dallery Smith II, and Jennifer Ying.

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ....................................................................vi

STATEMENT OF RELATED CASES ......................................................xi

PRELIMINARY STATEMENT ................................................................1

COUNTERSTATEMENT OF THE ISSUES.............................................3

COUNTERSTATEMENT OF THE FACTS ............................................4

    A.    XU's Expert-Location Software............................................5

    B.    XU's Participation In Cisco's Partner Program ...................7

    C.    XU's Application To The SolutionsPlus Program.............................7

    D.    The Proceedings Below....................................................13

        1.    The Summary Judgment Rulings.............................13

        2.    The Trial......................................................................15

        3.    The JMOL Order........................................................16

SUMMARY OF ARGUMENT ...............................................................17

STANDARDS OF REVIEW ...................................................................20

ARGUMENT ...........................................................................................21

I.    THE DISTRICT COURT CORRECTLY GRANTED JUDGMENT AS A MATTER OF LAW ON XU'S FRAUDULENT-CONCEALMENT CLAIM................................................................................................21

    A.    No Reasonable Jury Could Find It Material That Cisco Disclosed That XU's SolutionsPlus Application Was "Not Approved" Rather Than "Denied" .......................................................22

        1.    XU Failed To Prove Any Material Difference Between "Not Approving" and "Denying" A SolutionsPlus Application..............................................22

# TABLE OF CONTENTS
## (continued)

**Page**

    2.    The District Court Did Not Impose An Improper Burden On XU ...............................................................................27

    3.    XU Improperly Advances Fraud Theories Not Tried To The Jury ....................................................................................29

    4.    XU'S Remaining Objections Are Unavailing ..........................31

  B.    No Reasonable Jury Could Have Found That Cisco's Delay In Disclosing The "Denial" Of XU's SolutionsPlus Application Caused XU To Lose All Value ..........................................................33

II.    THE JUDGMENT MAY BE AFFIRMED ON THE ALTERNATIVE GROUND THAT THE JURY'S AWARD OF $70 MILLION IN LOST-VALUE DAMAGES WAS SPECULATIVE IN AMOUNT ......................36

III.    IN THE ALTERNATIVE, CISCO IS ENTITLED TO NEW TRIAL ON FRAUDULENT CONCEALMENT ............................................................42

  A.    The Jury's Findings Of Materiality And Causation Are Against The Great Weight Of The Evidence .....................................................43

  B.    The District Court Improperly Admitted Unreliable Expert Testimony On Damages .....................................................................45

  C.    The Jury's $70 Million Fraud Verdict Is Excessive ...........................46

IV.    THE DISTRICT COURT CORRECTLY REJECTED XU'S REQUEST FOR AN INSTRUCTION ON PUNITIVE DAMAGES BECAUSE HERNANDEZ WAS NOT CISCO'S "MANAGING AGENT" .................47

V.    THE DISTRICT COURT CORRECTLY ENTERED SUMMARY JUDGMENT FOR CISCO ON XU'S TRADE-SECRET AND CONTRACT CLAIMS ...........................................................................49

  A.    XU Raises No Genuine Issue With Respect To Its Trade-Secrets Claim ...............................................................................................50

    1.    XU's Misappropriation Theory Is Waived ...............................50

iv

3.    There Is No Genuine Issue As To Whether XU's Claimed
       Trade Secrets Were Widely Known .........................................59

B.    XU Fails To Raise A Genuine Issue With Respect To Its Breach-
       Of-Contract Claim ................................................................60

CONCLUSION ......................................................................................61

PROOF OF SERVICE ...........................................................................62

CERTIFICATE OF COMPLIANCE .....................................................64

## CONFIDENTIAL MATERIAL OMITTED

The materials omitted from pages 39, 52-57 and 59 of this brief describe XpertUniverse, Inc.'s purported trade-secret information and contain revenue projections drawn from third-party valuation reports that were designated confidential by XU and which were not admitted into the evidence at trial.

# TABLE OF AUTHORITIES

## Cases

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
    566 F. Supp. 2d 305 (S.D.N.Y. 2008) ...................................................42

*Ajaxo Inc. v. ETrade Fin. Corp.*,
    187 Cal. App. 4th 1295 (2010) ...........................................................41

*AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*,
    432 F. Supp. 2d 1319 (S.D. Fla. 2006)
    *aff'd*, 294 F. App'x 501 (11th Cir. 2008) ..............................37-38, 41

*Bank of Am. Corp. v. Superior Court*,
    198 Cal. App. 4th 862 (2011) .......................................................21, 28

*Barton v. Alexander Hamilton Life Ins. Co. of Am.*,
    110 Cal. App. 4th 1640 (2003) ...........................................................48

*Berkeley Inv. Grp., Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006) ...............................................................58

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*,
    350 F. Supp. 2d 582 (D. Del. 2004) .....................................................46

*Chrysler Credit Corp. v. J. Truett Payne Co.*,
    670 F.2d 575 (5th Cir. 1982) ..............................................................23

*Cruz v. HomeBase*,
    83 Cal. App. 4th 160 (2000) ...............................................................48

*Data Race, Inc. v. Lucent Techs., Inc.*,
    73 F. Supp. 2d 698 (W.D. Tex. 1999) ..................................................41

*Daubert v. Merrell Dow Pharmaceuticals*,
    509 U.S. 579 (1993) ...........................................................................45

*Donlin v. Philips Lighting N. Am. Corp.*,
    581 F.3d 73 (3d Cir. 2009) .................................................................46

*e360 Insight v. Spaumhaus Project*,
    500 F.3d 594 (7th Cir. 2007) ..............................................................42

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Elcock v. Kmart Corp.*,
  233 F.3d 734 (3d Cir. 2000) ...............................................45

*Engalla v. Permanente Med.l Grp., Inc.*,
  938 P.2d 903 (Cal. 1997) ...................................22, 28, 29

*Fenner Invs., Ltd. v. Hewlett-Packard Co.*,
  2010 WL 3911372 (E.D. Tex. Apr. 16, 2010)..................41

*Fineman v. Armstrong World Indus., Inc.*,
  980 F.2d 171 (3d Cir. 1992) ..............................................44

*Floyd v. Hefner*,
  556 F. Supp. 2d 617 (S.D. Tex. 2008) ..............................41

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*,
  380 F.3d 849 (5th Cir. 2004) ............................................41

*Foster v. Nat'l Fuel Gas Co.*,
  316 F.3d 424 (3d Cir. 2003) ..............................................43

*Gasperini v. Ctr. for Humanities, Inc.*,
  518 U.S. 415 (1996)...........................................................46

*Grupe v. Glick*,
  26 Cal. 2d 680 (1945) ........................................................36

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008) .........................51, 57, 60

*Hartranft v. Apfel*,
  181 F.3d 358 (3d Cir. 1999) ..............................................21

*Huber v. Taylor*,
  469 F.3d 67 (3d Cir. 2006) ................................................30

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*,
  2010 WL 4065465 (S.D. Tex. Oct. 9, 2010) .....................41

# TABLE OF AUTHORITIES
## (continued)

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*,
  650 F.3d 915 (3d Cir. 2011) ...............................................................21

*In re Kane*,
  628 F.3d 631 (3d Cir. 2010) ..............................................................21

*Kids' Universe v. In2Labs*,
  95 Cal. App. 4th 870 (Cal. Ct. App. 2002)...........................37, 41, 42

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) .....................................................................51

*Lesende v. Borrero*,
  2014 WL 1924726 (3d Cir. May 15, 2014)................................30, 50

*Meteorlogic, Inc. v. KLT, Inc.*,
  368 F.3d 1017 (8th Cir. 2004) ..........................................................45

*Mirror Worlds, LLC v. Apple, Inc.*,
  784 F. Supp. 2d 703(E.D. Tex. 2011),
  *aff'd on other grounds*, 692 F.3d 1351 (Fed. Cir. 2012) ...................41

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
  476 F. Supp. 2d 1143 (N.D. Cal. 2007)..............................................41

*Myers v. Trendwest Resorts, Inc.*,
  148 Cal. App. 4th 1403 (2007) ..........................................................47

*Parlour Enters., Inc. v. Kirin Grp., Inc.*,
  152 Cal. App. 4th 281 (2007) ......................................................39, 40

*Piscitelli v. Friedenberg*,
  87 Cal. App. 4th 953 (2001) ..............................................................36

*Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.*,
  171 S.W.3d 905 (Tex. App. 2005).....................................................41

*Ray v. Pinnacle Health Hospitals, Inc.*,
  416 F. App'x 157 (3d Cir. 2010) .......................................................50

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
   563 F.3d 1358 (Fed. Cir. 2009) .............................................................44

*Roby v. McKesson Corp.*,
   47 Cal. 4th 686 ( 2009) ..................................................................48, 49

*Sargon Enters., Inc. v. Univ. of S. Cal.*,
   55 Cal. 4th 747 (2012) .................................................................36, 37

*Silvaco Data Sys. v. Intel Corp.*,
   184 Cal. App. 4th 210 (2010) .......................................................51, 52

*Spring Design, Inc. v. Barnesandnoble.com, LLC*,
   2010 WL 5422556 (N.D. Cal. Dec. 27, 2010)............................58, 59

*Stevens v. Parke, Davis & Co.*,
   9 Cal. 3d 51 (1973) ............................................................................46

*TK-7 Corp. v. Estate of Barbouti*,
   993 F.2d 722 (10th Cir. 1993) ....................................... 40, 41, 45-46

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999) ..............................................................45

*Think Village-Kiwi, LLC v. Adobe Sys., Inc.*,
   2009 WL 3837270 (N.D. Cal. Nov. 16, 2009) ..................................59

*TypeRight Keyboard Corp. v. Microsoft Corp.*,
   374 F.3d 1151 (Fed. Cir. 2004) ........................................................58

*W.V. Realty, Inc. v. N. Ins. Co.*, ,
   334 F.3d 306 (3d Cir. 2003) ..............................................................20

*White v. Ultramar, Inc.*,
   21 Cal. 4th 563 (1999) ......................................................................47

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ..............................................................45

# TABLE OF AUTHORITIES
## (continued)

**Page**

### Statutes and Rules

CAL. CIV. CODE § 3294(b) ....................................................47

CAL. CIV. CODE § 3426.1(d) ................................................51

CAL. CIV. CODE § 3426.1(d)(1)............................................59

FED. R. CIV. P. 50(c)............................................................43

FED. R. CIV. P. 50(c), advisory committee's note (1963) ........43

FED. R. CIV. P. 56(a)............................................................21

### Miscellaneous

*Bartlett's Roget's Thesaurus* (1996)......................................24

*The American Heritage Dictionary of the English Language* (3d ed. 1992) ..........24

*Webster's Third New Int'l Dictionary* (1993)..........................24

## STATEMENT OF RELATED CASES

Counsel is aware of no case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## PRELIMINARY STATEMENT

This dispute over a software technology for locating experts is no longer a patent case: The jury awarded plaintiff XpertUniverse, Inc. ("XU") $34,383 in patent damages; neither party is appealing that award; and Cisco Systems, Inc. ("Cisco") sent XU full payment in satisfaction of that judgment on May 12, 2014. All that is at issue on this appeal are XU's claims under California law for supposed fraud, trade secret misappropriation and breach of contract. The district court (Andrews, J.) properly granted Cisco summary judgment on the trade-secret and contract claims and JMOL on the fraud claim, overturning the $70 million in lost-value damages that the jury had awarded XU. The district court's judgment should be affirmed.

*First*, the district court properly overturned the $70 million fraud damages award on JMOL. XU's sole fraud theory at trial was that Cisco had fraudulently concealed for nine months that XU's application to Cisco's SolutionsPlus partner program had been "denied," even though XU knew that the application was "not approved." The district court correctly found the evidence insufficient to show that any such semantic difference was material. The district court also correctly found the evidence insufficient to show that, but for Cisco's nine-month concealment of the "denial," XU would have found other partners and not lost all its value. XU cannot now advance new fraud theories to cover up the shortcomings in the one it presented at trial.

1

*Second*, the JMOL for Cisco on the fraud claim may be affirmed on the alternative ground that the jury's award of $70 million in damages for purported lost business value was impermissibly speculative. California law requires that the amount of damages be proven with reasonable certainty, a requirement that applies with special force to an unestablished business like XU, which had no customers, no sales, and no finished product. The evidence was insufficient to support a $70 million valuation for such a company.

*Third*, if the fraud JMOL were reversed (which it should not be), Cisco would be entitled to a new trial because the $70 million jury award was against the great weight of the evidence, was based on inadmissible expert testimony, and was excessive.

*Fourth*, the district court properly rejected XU's request for an instruction on punitive damages based on XU's theory that John Hernandez, the director of product management at Cisco's Customer Contact Business Unit ("CCBU"), was a "managing agent" whose actions were imputable to Cisco. XU failed to show that Hernandez exercised the company-wide authority needed to qualify as a managing agent under applicable California law.

*Fifth*, the district court properly granted summary judgment to Cisco on XU's trade-secret misappropriation and contract claims. XU would have this Court now compare diagrams of its and Cisco's products, but XU did not make this comparison

2

in the district court and, in any event, the components appearing on both Cisco diagrams are too general to qualify as trade secrets. XU's arguments concerning its contract claim similarly fail.

The judgment should be affirmed.

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether the district court correctly entered JMOL for Cisco on XU's fraud claim because no reasonable juror could find (a) that there is a material difference between an application's "denial" and "non-approval" and/or (b) that any concealment of the "denial" caused XU to lose $70 million in value.

2.      Whether JMOL for Cisco on the fraud claim may be independently affirmed on the ground that the $70 million lost-value damages award was impermissibly speculative.

3.      Whether, if the fraud JMOL were reversed, Cisco would be entitled to new trial because (a) the fraud verdict was against the great weight of the evidence; (b) the testimony of XU's damages expert was inadmissible; and/or (c) the $70 million lost-value award was excessive.

4.      Whether the district court correctly rejected XU's request for a punitive-damages jury instruction because the evidence was insufficient to show that John Hernandez was a "managing agent" with discretionary authority over Cisco's corporate policy.

3

5.    Whether the district court correctly (a) entered summary judgment for Cisco on XU's trade-secret misappropriation claim where XU failed to raise a genuine issue of fact as to Cisco's use of protected information; and (b) entered summary judgment for Cisco on XU's unsupported contract claim.

## COUNTERSTATEMENT OF THE FACTS

This case arises out of the failure of XU, a start-up company that sought to sell expert-location software for corporate call centers.  Although XU operated from 1999 to 2007, it never produced a finished product or made any actual sales.  From mid-2004 to the end of 2006, XU sought to jointly market its software with Cisco, which has a business unit supplying hardware and software to corporate call centers.  In 2009, after Cisco introduced several expert-location products, XU sued Cisco, asserting claims for patent infringement, trade-secret misappropriation, and breach of contract.  XU later added claims for fraudulent misrepresentation and concealment.  Its patent-infringement claims and one theory of fraudulent concealment survived summary judgment and went to trial.  In a verdict not at issue on appeal, the jury found patent infringement and awarded $34,383 in damages.  The jury also found fraudulent concealment and awarded $70 million, XU's supposed value in April 2006, but the district court granted Cisco JMOL because XU had failed to present sufficient evidence of either materiality or causation to support the jury's fraud verdict.

Although XU describes at great length the evidence it presented at trial (Br. 11-52), it fails to acknowledge the crucial admissions by its witnesses and uncontradicted documentary evidence that, even drawing all inferences in XU's favor, support the JMOL on fraud. It is therefore necessary to briefly restate the relevant facts.

## A.    XU's Expert-Location Software

As the testimony of XU's founder Victor Friedman and its former president Elizabeth Eiss established, XU was a start-up that in more than seven years of operation never turned its technology into a finished product or sold it to a single customer. As Friedman explained, XU was formed in 1999 with the idea of helping children with their homework by connecting them with teachers and tutors. A1081:252. Friedman, however, discovered that there was "really no money" in this endeavor, A1082-83:257-58, and XU shifted its focus to helping corporate call centers connect customers with subject-matter experts in corporations, A1083-84:258-63.

Friedman also testified that an April 2004 XU demonstration interested Laurent Philonenko (then the chief executive officer of Genesys, a software company with call center products) and led to talks between XU and Genesys. A1085-86:267-72. That summer, Philonenko moved to Cisco, A1086:272-73, where he became general manager of Cisco's CCBU, a unit that primarily sells hardware and software to corporate call centers, A1618:1702, and XU began working with Cisco to integrate its software into Cisco's routers, A1087:274-77. As XU points out (Br. 28), when XU

5

demonstrated its product, Cisco found its capabilities and taxonomy promising. A1515:1484-86; A1645:1808; A5310:8-9; A5373-74.

As Eiss admitted, however, XU's demonstrations were "canned": They showed how XU envisioned its software would work, not software operating in a live system. A1201:574-75. Moreover, in an August 2004 memorandum, Cisco engineers expressed concerns about XU's engineering capability, A10943-44; A1516-17:1487-891, which proved prescient. As numerous documents demonstrate, despite Cisco's assistance, XU struggled for over two years to integrate its software with Cisco products, A11075-76; A11098-99; A11059-62; A1201-03:577-82, and, although Friedman claimed at trial that XU finished integrating with Cisco in late November 2006, XU never validated its software's interoperability, A10953; A1101:331; A1646:1813. Indeed, Eiss and John Steinhoff, XU's former director of technology, admitted on cross-examination that XU never developed a fully finished, operable product for Cisco, Genesys, or otherwise. A1200:570-73; A1234:706-08; A1246:754-55. Eiss and Steinhoff also admitted that, while XU came close to doing a pilot project with CitiGroup in mid-2006, A1349-51, it never had any actual sales or customers, A1200:571; A1206:596; A1246:755.

As internal XU e-mails acknowledge, long before the CitiGroup pilot project fell through in December 2006, *see* A1657:1858-59, XU was out of funds and most of

its staff had departed, including Eiss.  A1198:563; A11076.  As Friedman testified, XU shut down in July 2007.  A1106:352.

### B.    XU's Participation In Cisco's Partner Program

XU began trying to integrate its software into Cisco's call-center platform after demonstrating its product to Cisco in August 2004.  *See* A1087:274-77; A10932. About eight months later, in April 2005, XU applied to participate in Cisco's Technology Developer Partner Program ("TDPP").    A11046-57; A1073:220. Participants in that program pay a small fee that entitles them to assistance from Cisco engineers in integrating their products with Cisco products.  A1614:1684-85.  After completing the integration, participants may test and validate the "interoperability" of their products with Cisco products, A1615:1690-91; A11030-44; A11046-57, and, if validated, their products may be included in Cisco's price book, helping them to market to Cisco's customer base, A1613-14:1682-87.  XU renewed its participation in the TDPP in August 2006, A11030-44, but never tested its software for interoperability with Cisco products, A1646:1813.

### C.    XU's Application To The SolutionsPlus Program

*The SolutionsPlus Program*—XU's Eiss testified that, in December 2005, Cisco's Hernandez invited XU to apply for SolutionsPlus.  A1173:462, A1191:535-36; A1612:1676; A10954-62.  Products admitted into this program, which is open only to TDPP participants, A5129; A5142, are sold at full commission by Cisco's

7

sales staff. A1335:940; A1337:948-49; A1615:1689; A5137. As Eiss acknowledged, this is a potentially huge benefit given Cisco's extensive sales force. A1190:530-31; A1335:940-41.

Cisco informed XU in a January 2006 presentation that the SolutionsPlus Program is "VERY selective." A5129. Uncontroverted testimony showed that Cisco invests resources in selling and supporting products admitted into the program, A1622:1716, and therefore carefully screens applications, A1209:606-07; A5133; A11063-64; A11021-29. A product must be approved by the relevant product manager, A5133; A11063-64, by the SolutionsPlus Governance Council, which contains representatives from sales, marketing and other areas of the company, A1325:902; A1615-16:1690-92, and by Cisco engineers, A1620:1709-10; A5133; A11063-64. And products thus selected for SolutionPlus undergo a 90-day test period, after which Cisco decides "in its sole discretion" whether to continue the product in the program for a two-year period. A5142; A5151.

*The Denial of XU's Application*—Eiss testified that XU accepted the invitation to apply to the SolutionsPlus Program because it wanted the assistance of Cisco's sales staff. A1190:531-32. As shown in deposition testimony XU presented at trial, Cisco product manager Balaji Sundara prepared XU's application. A1343:971-73. As Eiss acknowledged, she and Sundara developed a presentation on XU's product,

A1194:548-49; A1208:604-03; A11063-64, which Sundara gave to the SolutionsPlus

Governance Council on April 19, 2006, A10945-48; A1344:975.

As evidence presented by XU showed, the Council rejected XU's application,

stating that XU "appeared as niche product" and that the Council did not see

"horizontal revenue pull through," or Cisco sales resulting from XU sales.  A10948;

A1338:952.  The Council also expressed concerns about whether Cisco personnel

could sell XU's product effectively.  A11132; *see also* A10948 (suggesting that Cisco

acquire XU or make it an original equipment manufacturer).

Eiss admitted at trial that she knew that "our [XU's] application had been

submitted to the Council," A1215:633, and "***knew, of course, that we [XU] didn't***

***have an approval***," A1216:635 (emphasis added).

*The Decision to Continue Pursuing XU's Admission*—After XU's

SolutionsPlus application was denied, it returned to CCBU, which spent several weeks

considering whether to continue pursuing XU's admission into SolutionsPlus.  On

April 24, 2006, five days after XU's application was rejected, Sundara's supervisor

Ross Daniels spoke to Hernandez, who "was surprisingly upbeat."  A5086.  As

Hernandez explained at trial, the Council's objections were common ones that could

be overcome, A1630-31:1751-52, and he committed to try to do so, A1632:1757-58.

The following week, Hernandez e-mailed Robert DePinto of Cisco's CitiGroup

team.  A5056.  By May 2006, CitiGroup was close to entering into a pilot project with

9

XU and Cisco, A5085-86; A1350:1001.  Hernandez told DePinto that, if a good business case for XU could be made, Hernandez would push XU's admission to SolutionsPlus.  A5056; A5085.

On May 12, 2005, DePinto e-mailed Hernandez a "strong recommendation" for XU's admission into SolutionsPlus based on the "significant revenue opportunity" at CitiGroup for XU's technology.  A11132.  As a presentation prepared by DePinto noted, CitiGroup was the world's largest financial services firm as well as Cisco's largest enterprise customer, and XU's technology would position Cisco to further acquire enterprise users there.  A11142; A11145.  Armed with DePinto's support, Hernandez e-mailed Philonenko recommending that Hernandez share the CitiGroup opportunity with Carl Wiese (the vice-president on the Governance Council representing Cisco's sales organization) and Richard McLeod (a senior director who represented "channels," or resellers of Cisco products, on the Council) to see if XU could be admitted into SolutionsPlus.  A1325:902; A1337:949; A11132.

*Hernandez's Efforts to Overcome the Council's Objections*—As numerous e-mails document, Hernandez sought over the next six months to overcome the Governance Council's concerns about admitting XU to SolutionsPlus.  In June, he asked XU's Eiss for help countering the Governance Council's objections concerning Cisco's ability to market XU.  A11148-50; A11151.  For two months, Eiss and Hernandez developed a presentation addressing, among other things, whether Cisco's

10

internal sales force and its "channel" partners would be able to sell XU's product. A11097; A11102-03; A11077-78.  At the same time, Hernandez worked to secure the backing of Cisco's IBM account team, which he did in late August.

Hernandez testified that, to overcome the Council's objection that XU was a niche product without substantial potential revenue, XU needed a "lighthouse" account, or lead customer, to prove demand for XU.  A1627:1738; A1631:1755. Although the CitiGroup pilot project would have provided such an account, A1627:1738; A1631:1752-54, in October 2006, Hernandez pursued another potential "lighthouse" account:  When he learned that Cisco needed to supply "Competency Based Routing" for a FedEx bid, A11067-68, Hernandez proposed using XU, which Cisco could do if it admitted XU into SolutionsPlus and made it a Cisco product, A11065.

As contemporaneous e-mails document, in early October 2006, Hernandez approached Wiese.  A11100.  Hernandez testified that he was able to allay Wiese's concerns about XU being only a niche product and the ability of Cisco and its partners to sell XU.  A1638-39:1783-84.  Hernandez also addressed Wiese's concerns about Cisco's near- and long-term plans for XU, explaining that Cisco products eventually would be substituted for IBM components in XU's product but that Cisco would keep XU's taxonomy, which Hernandez described as XU's "secret sauce" that "adds value."  A11100; A1639-40:1784-89*; A1645:1808.  In an October 6, 2006 e-mail,

Wiese informed Hernandez "I can support this [XU] via Solution +…."  A11100; A1640:1789-90.

*The Failure of the "Lighthouse" Accounts*—As Hernandez testified, the FedEx opportunity did not materialize, A1640:1791, and, as Friedman admitted, the CitiGroup pilot project fell through "because of internal problems ... at Citibank." A1106:350.  Although CitiGroup had signed a statement of work, the project had not been finalized, and Citigroup had a major reorganization in the summer of 2006 resulting in significant layoffs.  A1100-01:329-30; A1351:1003-04.  The XU project was put on hold, *id.*, and in December 2006 CitiGroup informed XU and Cisco that no business unit in CitiGroup would back it; the project was cancelled shortly thereafter. A11058; A1352-53:1010-12; A1642:1797-98.

Hernandez testified that, because XU no longer had the necessary lighthouse account, he concluded that XU no longer had any chance of admission into SolutionsPlus.  A1642-43:1799-800.  As documented in a January 2007 e-mail, Hernandez telephoned Friedman to explain that Cisco still wanted XU to participate in the TDPP, which would allow Cisco and XU to "jointly sell side by side in the market place."  A10953.  As Friedman testified, however, by this point, XU had no more funding and could not continue operating.  A1102:335-36.

### D.     The Proceedings Below

In September 2008, Cisco introduced several expert-location products. A10199-200. Five months later, XU sued Cisco, asserting, among other things, patent infringement, trade-secret misappropriation, and breach of contract. A10016-25. In May 2010, XU added claims alleging that Cisco had fraudulently concealed its use of XU trade secrets and confidential information in patent applications and in developing competing products. A10083-91; A10096-106. XU also alleged that Cisco had made fraudulent misrepresentations, including falsely promising to admit XU into SolutionsPlus. A10084; A10096; A10100.

### 1.     The Summary Judgment Rulings

After completion of discovery, Cisco moved for partial summary judgment. The district court granted the motion, dismissing most of XU's claims, including all of its trade-secret claims, all but two contract claims, and all but one fraud theory. A49-52; A76-77.

The district court granted summary judgment on XU's trade-secret claims for two reasons. *First*, XU's descriptions of all but two asserted trade secrets were too generalized to identify its claimed trade secrets with sufficient specificity. A56-62. *Second*, as to two asserted trade secrets (numbers 18 and 33) that the court deemed sufficiently specific because of references to diagrams containing specific information, the court ruled that XU had failed to raise a genuine issue whether Cisco

13

had used these purported trade secrets in any Cisco product.  A61-62 & n.5.  Despite years of litigation and discovery, XU relied solely on expert testimony finding the "*functions* of trade secrets 18 and 33 'embodied' in Cisco projects."  A62 (emphasis added).  The district court held that this testimony raised no triable issue because it failed to identify the "*information* in XU's cited diagrams 'embodied' in any Cisco project."  *Id.* (emphasis added).  In addition, the court noted, Cisco had presented undisputed evidence that its products were developed "without the use of any XU trade secrets."  *Id.*

The district court similarly granted summary judgment with respect to XU's claim for breach of a non-disclosure agreement (the "NDA") that the parties executed in August 2004.  *See* A5021-22.  XU failed, the court ruled, to raise a genuine issue whether Cisco had disclosed information from seven of the nine documents that XU had designated "confidential" under the NDA.  A64-65.  The court later excluded the testimony of XU's expert concerning damages from disclosure of the remaining two documents, A10834, and declined to submit the contract claims to the jury because XU produced no other evidence of contract damages, A1029-30; XU Br. 49 n.6.

The district court also granted summary judgment on all but one of XU's fraud theories.  XU defended only one of the fraud theories in its pleadings—namely, that Cisco had falsely promised to admit XU into the SolutionsPlus program.  The court ruled that XU had not raised any genuine issue concerning that theory or another

14

theory newly raised on summary judgment—namely, that Cisco had misrepresented that the TDPP agreement was a mere formality. A6036-37; A6044. The district court, however, found that XU had raised genuine issues concerning another newly raised fraud theory—namely, whether "whether Cisco concealed XU's status in the SolutionsPlus program." A67-68; A76. While permitting XU to pursue this new theory, the court warned XU that it could not raise more new theories at trial, A10779, and ordered that at trial XU's fraud claim would be "limited to the theory that Cisco concealed from XU that XU had been denied participation in the SolutionsPlus program," A10824.

### 2.    The Trial

The case proceeded to jury trial in March 2013 on XU's patent-infringement and fraud claims. A1055:146-49. Finding that XU had not presented evidence that any Cisco officer or director defrauded XU or that Hernandez was a Cisco managing agent, the district court declined to instruct the jury on punitive damages. A1688-89; A1752-53. The jury found that one Cisco product (Pulse) did not infringe XU's patents but that two others (Expert Advisor and Remote Expert) did, and awarded XU a total of $34,383 in infringement damages. A45-47.

The jury also found that XU had proven fraudulent concealment. A45. Relying upon testimony from XU's damages expert Walter Bratic that XU was supposedly worth $70 million in April 2006 when the Governance Council denied its

15

SolutionsPlus application, but nothing by January 2007 when Cisco disclosed the denial, A18; A1473-74:1316-20, the jury awarded XU $70 million in damages for its fraudulent-concealment claim, A45.

### 3.    The JMOL Order

After trial, Cisco moved for JMOL or, in the alternative, new trial.  The district court granted JMOL for Cisco on XU's fraudulent concealment claim, A13-29, but denied the motion with respect to XU's patent-infringement claims, A8.

The district court ruled that XU's fraudulent-concealment claim failed as a matter of law on two independent grounds.  *First*, the court ruled that XU had not presented substantial evidence of a material nondisclosure.  Eiss had admitted on cross-examination that she knew that XU's application had been submitted to the Council but was "not … approv[ed]" in April 2006.  While  Cisco later, in January 2007, used the word "denied" about the SolutionsPlus application , the court found that there was not "sufficient evidence from which a jury reasonably could find that there is a material difference between not being approved, and being denied."  A15; *see* A13-17.  This was especially so as contemporaneous documents showed that Hernandez had continued to work for XU's admission into SolutionsPlus for months after the rejection of XU's application in April 2006.  A16-17.  The court concluded: "There is insufficient evidence for a jury to find that a reasonable person would attach

importance to the knowledge that XU was 'denied,' as opposed to not approved, in determining his choice of action in the transaction in question." A17.

*Second*, the district court ruled that, as an independently sufficient ground for JMOL on fraud, "[t]here is no substantial evidence from which the jury could have found that concealment of the 'denial' for nine months caused XU to forego, or lose, other valuable partnerships, and thereby lose its entire value." A21.

In light of these rulings, the district court did not reach the question whether the $70 million damages award was unduly speculative in amount given that XU was an unestablished business that never had a single sale. A5; A18. The court also initially treated Cisco's request for new trial as moot, A17, but later conditionally denied a new trial on liability, reasoning that, if its JMOL ruling were found erroneous, it could not conclude that the jury's verdict was against the clear weight of the evidence. A5-6; *see also* A6 (declining to reconsider the admissibility of XU's expert testimony).

## SUMMARY OF ARGUMENT

XU identifies no error in the judgment below.

**1.** The district court correctly concluded that no reasonable juror could have found Cisco liable for fraudulent concealment for two distinct and independent reasons. ***First***, there was insufficient evidence to support a finding under California law that Cisco concealed any *material* fact—that is, a fact to which a reasonable person would attach importance in determining a course of action. The case went to

17

the jury on the theory that Cisco had concealed the fact that XU's application to Cisco's SolutionsPlus program had been denied, but XU's former president admitted at trial that XU knew that its SolutionsPlus application was considered but not approved. Thus, Cisco's alleged concealment of the denial of XU's application was material only if there is an importance difference between an application that is "denied" and one that is "not approved." As the district court recognized, XU failed to present evidence of any such difference, and XU fails to point to any on appeal, instead relying improperly on fraud theories that were not presented to the jury.

*Second*, there was no evidence from which a reasonable jury could have found that, by concealing the "denial" of XU's SolutionsPlus application for nine months, Cisco caused XU to lose its supposed entire $70 million in value. Although XU asserts that it would have partnered with another company had the denial been disclosed immediately, XU presented evidence only that it had *opportunities* to partner with other companies, not that those partnerships were likely to occur, much less that they likely would have succeeded and enabled XU to retain its value. No reasonable jury could have found based on this evidence that, but for Cisco's alleged concealment, XU's business would have succeeded and attained $70 million in value.

**2.**     The judgment on XU's fraudulent concealment claim is also supported on the alternative ground, not reached by the district court, that the jury's $70 million damages award was impermissibly speculative in amount. Under California law, lost

18

profits and lost value based upon lost profits are recoverable only if and to the extent proven with reasonable certainty. Moreover, this requirement applies with special stringency to unestablished businesses like XU. The evidence presented by XU did not even begin to satisfy this requirement. XU's damages evidence consisted entirely of an expert opinion that XU—a company that had no sales, customers, or even a finished product—was worth $70 million in April 2006. That valuation rested on unverified projections by XU executives that XU would achieve $100 million in annual sales in less than five years. Such projections were wholly speculative.

**3.** If Cisco were not entitled to JMOL on the fraud claim, it would be entitled to a new trial: The jury's findings of materiality and causation, even if supported by sufficient evidence to avoid JMOL, were contrary to the great weight of the evidence; the district court improperly admitted speculative and unreliable expert testimony concerning XU's value; and, in view of the entire record, the $70 million awarded by the jury was excessive.

**4.** The district court correctly declined to instruct the jury on punitive damages. Under California law, punitive damages may be imposed on a corporation for an employee's conduct only if that employee was an officer, director, or "managing agent" of the corporation. XU argues that Cisco's Hernandez was a "managing agent," but failed to present evidence showing that Hernandez wielded the discretionary authority over company-wide policy that a managing agent must have.

**5.**     The district court correctly granted summary judgment on XU's trade-secret and contract claims. XU's argument on appeal that the district court should have compared various diagrams was not presented below; those diagrams are too high-level to show that Cisco's products use *specific* information of the sort protectable under California trade-secret law; and XU failed to show that its purported trade secrets were not generally known within the call-center industry.  XU's argument concerning its contract claim also was not presented below and is meritless.

The judgment should be affirmed.

## STANDARDS OF REVIEW

The district court's decision to grant judgment as a matter of law is reviewed de novo, and should be affirmed if, "viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence" to support the verdict.  *W.V. Realty, Inc. v. N. Ins. Co.*, 334 F.3d 306, 311 (3d Cir. 2003).  The district court's decision to deny a motion for a new trial is reviewed for abuse of discretion.  *See id.*

The district court's decision to grant summary judgment is reviewed de novo, and should be affirmed if, viewing the summary-judgment record in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 925 (3d Cir. 2011).

The court may affirm the district court's judgment "for any proper reason that appears on the record even where not relied on by it." *In re Kane*, 628 F.3d 631, 636 (3d Cir. 2010).

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY GRANTED JUDGMENT AS A MATTER OF LAW ON XU'S FRAUDULENT-CONCEALMENT CLAIM

Because XU failed to present sufficient evidence of either materiality or causation, the district court was correct in holding that XU's fraudulent-concealment claim failed as a matter of law.  Under California law, which the parties agreed governs XU's fraud claim, A13, plaintiffs claiming fraudulent concealment must prove both that the defendant "concealed or suppressed a material fact" and that, "as a result of the concealment or suppression of the fact, the plaintiff … sustained damages."  *Bank of Am. Corp. v. Superior Court*, 198 Cal. App. 4th 862, 868 (2011) (quotation omitted).  Moreover, to survive JMOL, plaintiffs must offer substantial evidence to support each element—that is, "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion" under review.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  XU failed to present such evidence of either materiality or causation.

21

### A.     No Reasonable Jury Could Find It Material That Cisco Disclosed That XU's SolutionsPlus Application Was "Not Approved" Rather Than "Denied"

The district court correctly held that XU had failed to prove that any delay in Cisco's disclosure of the "denial" of XU's application to the SolutionsPlus Program was material.   In a central admission that XU tries to ignore, XU's former president Elizabeth Eiss conceded that she and XU knew that XU's application had been submitted to Cisco's Governance Council but was "not … approv[ed]" in April 2006. A1216:635.  As the district court correctly found, A14-17, the record fails to support any material difference between knowing that a SolutionsPlus application was "not approved" (as Eiss admitted) and knowing that it was "denied."  Although XU asserts (Br. 56-63) that it presented substantial evidence of materiality, it fails to explain why the difference in phraseology between "denied" and "not approved" would have been important to a reasonable person.   Instead, XU seeks to deny the force of Eiss's admission, proffers fraud theories it did not and could not advance at trial, and protests the district court's supposed shift of the burden of proof.  Those efforts are unavailing.

### 1.     XU Failed To Prove Any Material Difference Between "Not Approving" and "Denying" A SolutionsPlus Application

Under California law, a fact is material only if "a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question."  *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal. 1997) (quotation omitted).  The district court correctly held that XU failed to

22

present evidence sufficient to prove that a reasonable person would find it important

that XU's SolutionsPlus application had been "denied" rather than "not approved."

To begin with, there can be no dispute that XU knew that its application had

been "not approved," even taking all inferences in favor of XU.  As the district court

noted, A14, Eiss admitted on cross-examination that "I knew our application had been

submitted to the Council," A1215:633, and that "***I knew, of course, that we did not***

***have an approval***."  A1216:635 (emphasis added).  XU does not even mention that

testimony until more than halfway through its brief (Br. 39-40 (citing A1215-16:630-

36)), and devotes only a single paragraph in its argument to the Eiss testimony (Br.

61) that remarkably omits Eiss's above-quoted admission.

Once that core admission is recognized as undisputed, as it must be, XU's

materiality arguments fail because XU cannot identify any evidence supporting an

inference that it matters whether a disappointed applicant knows that its SolutionsPlus

application was "denied" rather than "not approved."  At trial, Eiss was the only

witness who addressed the difference, and she offered only the conclusory testimony

that "those are two totally different things," asserting without explanation that "I don't

think it's something different.  I know it's something different."  A1216:636.  Such

conclusory statements cannot provide substantial evidence.  *See, e.g.*, *Chrysler Credit*

*Corp. v. J. Truett Payne Co*., 670 F.2d 575, 581-82 (5th Cir. 1982) (conclusory

assertions do not constitute substantial evidence).  This is especially so given ordinary

usage, in which there is no significant difference between denying an application and not approving it. Both denial and non-approval are forms of rejection. *See Bartlett's Roget's Thesaurus* 370 (1996). Accordingly, dictionaries define "deny" to mean "to refuse to grant" or "to decline to grant or allow," *Webster's Third New Int'l Dictionary* 603 (1993); *The American Heritage Dictionary of the English Language* 500 (3d ed. 1992)—that is, to not approve.

Nor did XU present any evidence that a "denial" has any special significance in the SolutionsPlus program. XU points (Br. 58) to testimony from Cisco's Carl Wiese and Balaji Sundara that it was important for XU "to know about the rejection." But neither Wiese nor Sundara suggested any important difference between SolutionsPlus applications "rejected" by way of "denial" and those that are declined by way of "non-approval." Wiese simply agreed that XU would have wanted to know the "outcome" of the Council's meeting. *See* A1339:956-57 ("Q. If you were in XpertUniverse's position, would you want to know the outcome of that governance council's meeting? A. Yes."). Similarly, Sundara testified only that a denial was "perhaps" important. *See* A1345:980 ("I guess they were cooperating with us in the SolutionsPlus agreement and the fact that it was a denial from the governance council would perhaps have been an important thing to know about.").

Moreover, uncontroverted evidence at trial showed that SolutionsPlus applications may be renewed after an initial denial, and thus that a denial lacks any

kind of "finality" that might have been significant to XU—an issue the district court

had left open for trial at summary judgment, A68.   An April 4, 2006 email from the

administrator of the SolutionsPlus program, which was designed "to make the

Solutions Plus approval process easier to understand," A11021, contains a diagram of

the process.  In the lower right-hand corner, the diagram shows that, if an application

is rejected by the Governance Council, it returns to the sponsoring product manager,

who may resubmit it:



A11024 (emphasis added); A1617:1698; A1620:1710-11.  In addition, Hernandez

presented uncontroverted testimony that SolutionsPlus applicants frequently undergo

multiple reviews.  A1621:1712-14.  XU cannot overcome this uncontroverted evidence by asserting (Br. 56) that Sundara "understood the rejection ended considering XU's product," for that testimony reflected only Sundara's "assumption" that no further work could be done after the Governance Council "rejected" a project, A1343:973, and that assumption was based on a January 2006 flowchart that was superseded by the April 2006 flowchart that governed in the relevant time frame.

Consistent with the uncontroverted evidence that SolutionsPlus applications may be renewed, contemporaneous internal Cisco documents show that Hernandez worked for months to assemble support for a renewed push to admit XU into SolutionsPlus.  *See* A5056-57; A5085-86; A11077; A11097; A11102; A11132; A11148-51.  For example, on May 3, 2006, two weeks after XU's application was denied, Sundara asked Ross Daniels if Cisco was going to continue pushing for XU's admission or pursue other options such as acquiring XU or partnering with it in the TDPP.  A5057; A1622:1719.  When Daniels inquired, Hernandez responded that he was waiting for Rob DePinto from the CitiGroup team to make a business case for XU's admission,  A5056, which DePinto did, A11132; A11142; A11145.  Hernandez then decided, in consultation with CCBU general manager Laurent Philonenko, to contact Wiese and Richard McLeod, two key members of the Governance Council, . A11100; A11132.  By October 2006, Wiese emailed Hernandez that "I can support [XU] via Solution +," A11100;  Hernandez emailed Daniels on October 12, 2006 that

"Carl [Wiese] has agreed on solutions plus…,"A5093; and David Bartell of Cisco's IBM team congratulated Hernandez on the "[g]reat news about Solutions+ and XU[]" and stated that he'd assembled an "engineering 'tiger team'" to help XU complete its integration, A11020.

Unable to dispute that evidence regarding Hernandez's efforts, XU instead merely insists (Br. 42, 60, 62-63) that it is entitled to an inference, based on language from two Daniels e-mails in May and October 2006 (A5056; A5093), that all this effort on Hernandez's and others' parts merely amounted to "deliberate[] stalling" while Cisco supposedly concealed the application's denial in order to protect Cisco's other opportunities.  But XU fails to explain how that inference, even if credited, suggests why it would have been material for XU, during this period of Hernandez's supposed "stalling," to know that its SolutionsPlus application had been "denied" rather than not approved.  That was the only fraud theory before the jury, and even taking all inferences in XU's favor, XU failed to prove materiality under that theory.

## 2.    The District Court Did Not Impose An Improper Burden On XU

Unable to suggest any material distinction between a SolutionsPlus application that is "denied" and one that is "not approved," XU accuses the district court (Br. 61-62) of imposing an "improper burden" upon it by requiring proof that it would have acted differently had the "denial" of the SolutionsPlus application not been concealed.

In fact, the district court derived this supposed burden from XU's own argument that the jury could have inferred such a difference.  A16 (citing D.I. 725, at 7.)

In any event, in concluding that "[t]here is insufficient evidence for a jury to find that a reasonable person would attach importance to the knowledge that XU was 'denied,' as opposed to not approved, *in determining his choice of action in the transaction in question*," A17 (emphasis added), the district court simply followed the standard adopted by the California Supreme Court, which treats a fact as material "if a reasonable person would attach significance to its nonexistence *in determining his choice of action in the transaction in question*," *Engalla*, 15 Cal. 4th at 977 (quotation omitted) (emphasis added).

Moreover, XU has no basis for objecting that it was required to prove that it would have acted differently absent the alleged fraudulent concealment.  To prove reliance under California law, XU had to show that it "would not have acted as [it] did if [it] had known of the concealed or suppressed fact."  *Bank of Am.*, 198 Cal. App. 4th at 868 (quotation omitted).  Indeed, XU recognized in its own proposed jury instructions that it had to prove that "Cisco's concealment … caused XpertUniverse to either (a) forego other business opportunities, (b) continue working with Cisco, or (c) disclose confidential information."  A10861.  Contrary to XU's suggestion (Br. 62), the California Supreme Court did not reject a reliance  requirement in *Engalla*. *Engalla* held that a "misrepresentation of expeditiousness" in an arbitration system

28

could still be material to "a reasonable employer choosing a health plan for its employees" despite a statute providing for that arbitration system, 15 Cal. 4th at 978, but nothing in *Engalla* suggests that the California Supreme Court intended that statement to overturn the recognized requirement that plaintiffs claiming fraud must prove reliance and therefore show that they would have acted differently absent the asserted fraud.

### 3.    XU Improperly Advances Fraud Theories Not Tried To The Jury

Unable to overcome the Eiss admission that undermines the fraud theory it presented at trial, XU attempts to argue fraud theories that the jury did not and could not hear.  For example, XU asserts (Br. 56, *see id.* 52, 58, 59) that the jury "would have reasonably considered important … Cisco's secret decision to work with XU on only short-term, opportunistic sales while Cisco developed its own competing technology to replace XU's."

But that theory was not tried to the jury.  The district court declined to allow XU to raise additional new fraud theories at trial and, in a pre-trial ruling that XU has not challenged on appeal, expressly limited trial "to the theory that Cisco concealed from XU that XU had been denied participation in the SolutionsPlus program." A10824; A52.  The district court therefore instructed the jury that XU was claiming that "Cisco committed fraud by concealing XpertUniverse's status in a Cisco partner program called Solutions Plus." A1055:147-48; *see* A1785:2164-66.  The theory that

29

Cisco fraudulently concealed its development of competing technology and intent to use XU only for short-term sales was not presented to the jury and cannot furnish any basis for reversing the JMOL here.

XU is especially precluded here from seeking reinstatement of the jury's verdict based on a fraud theory not presented at trial because XU failed to mention that theory in opposing Cisco's JMOL motion. *See* D.I. 725, at 4-11. "Theories not raised squarely in the district court cannot be surfaced for the first time on appeal…." *Lesende v. Borrero*, 2014 WL 1924726, at *7 (3d Cir. May 15, 2014) (citation omitted); *see also Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006) ("Generally, failure to raise an issue in the District Court results in its waiver on appeal.") (quotation omitted).

Moreover, even if XU could defend the jury verdict based on a fraudulent-concealment theory not presented to the jury (which it may not), XU's theory still fails. *First*, Cisco's supposedly secret decision to work only on short-term, opportunistic sales while developing its own competing technology fails to show any material difference between denying and not approving a SolutionsPlus application. *Second*, XU failed to present evidence of other essential elements of this new concealment claim, including that XU was unaware that Cisco might be developing competing products. *See* A1028:79 (noting that XU and Cisco recognized each other as competitors in 2006).

30

XU's other new fraud theories similarly fail.  XU asserts (Br. 59) that Cisco "led XU to believe SolutionsPlus was a certainty upon integrating its technology with Cisco's router."  That theory was not presented to the jury because the district court held on summary judgment that XU had failed to raise any genuine issue concerning such a promise.  A67.  Not surprisingly, XU now fails to cite any evidence of such a promise, which demonstrates that this theory is meritless as well as waived.  XU also asserts  (Br. 59-60) that Cisco should have explained to XU its chances of acceptance into the SolutionsPlus program after denial of its initial application, and disclosed that many applications are accepted after an initial denial.   But XU did not argue below that Cisco should have made such disclosures, thereby waiving those arguments, and it fails to show that Cisco had a duty to make such disclosures.

### 4.     XU'S Remaining Objections Are Unavailing

In addition to asserting fraud theories not presented to the jury, XU points to evidence that does not concern materiality.  For example, XU notes (Br. 56-58) evidence that Cisco was worried that XU would partner with Genesys and give Genesys an important opportunity with Citigroup.  Such evidence does not establish a material difference between an application that is denied and one that is not

approved.[1]  Evidence that XU spent time and money trying to integrate its software with Cisco's router (*see* XU Br. 57) and that XU had partnering opportunities besides Cisco (*id.* at 57-59, 61) likewise sheds no light on the importance of any difference between denying and not approving an application.  XU's assertions (Br. 59-60) that "Cisco would not have concealed the truth so vigilantly if a reasonable person would have considered it 'obviously unimportant'" and that "Cisco concealed the denial [of XU's SolutionsPlus application] precisely because Cisco knew it was material," shed no light on materiality either because they are circular:  If materiality could be inferred from the separate element of intentional concealment, the materiality requirement would be superfluous.  And XU's assertions (Br. 59-60) that "learning the truth in April 2006 would have been important to XU" and that "XU would reasonably would have wanted to know the truth to weigh its options" are merely conclusory.

In sum, XU's grab-bag of objections do not even begin to explain how a reasonable jury could have found it important that XU's SolutionsPlus application was "denied" rather than not approved and thus fail to undermine the district court's well-reasoned conclusion that XU failed to present substantial evidence of materiality.

---

[1]  XU also quotes improperly from two e-mails concerning Cisco's supposed motive that were properly excluded at trial because their potential for prejudice substantially outweighed their probative value.  *Compare* XU Br. 29 (quoting A5379) *with* A1170:451-52 (excluding e-mail chain).

**B.    No Reasonable Jury Could Have Found That Cisco's Delay In Disclosing The "Denial" Of XU's SolutionsPlus Application Caused XU To Lose All Value**

The district court also correctly granted JMOL on fraud on the separate and independent ground that XU failed to present sufficient evidence that concealment of the "denial" of its SolutionsPlus application caused XU to lose all value.  A17-21.  Although XU points to evidence of ***opportunities*** to partner with other companies, it fails to show that a reasonable jury could have found, based on the evidence presented at trial, that these opportunities would have resulted in any partnership, much less that the partnerships would have succeeded and sustained the $70 million value that XU claimed it had in April 2006.

*CitiGroup*—Although XU asserts (Br. 64, 65) that it could have partnered with CitiGroup, XU's founder Friedman conceded at trial that the Citibank opportunity disappeared because of internal problems at Citibank.  A20; A1106:350.  CitiGroup executive Harvey Koeppel testified that CitiGroup underwent a reorganization in the summer of 2006, and that as result there were no resources to fund even the contemplated XU pilot project.  A11058; A1349-51; A1642:1797-98.  Citing other testimony from Koeppel, XU asserts (Br. 64) that, in April 2006, CitiGroup was in a position to "proceed with XU 'fairly quickly.'"  In fact, Koeppel testified only that CitiGroup had conducted due diligence on XU and "***from an integration perspective***, we could proceed fairly quickly."  A1348-49 (emphasis added).  Koeppel did not say

that CitiGroup could have started the pilot project before the reorganization had XU

decided not to partner with Cisco after April 2006. To the contrary, he stated that it

was important to CitiGroup that XU had the support of a larger company such as

Cisco, A1349-50; A1352:1009, and XU did not present any evidence that CitiGroup

could have moved faster had XU partnered with another company.

*IBM*—XU asserts (Br. 44) that Friedman's testimony shows that IBM did not

purchase a product from XU "because XU was integrating Cisco's router to replace

the already integrated Genesys router." But XU did not present testimony from any

IBM witness, and Friedman did not testify that IBM would have purchased XU's

product with a Genesys router had XU not been attempting to integrate its product

with Cisco's router, but rather only that "IBM knew that we were integrating Cisco's

router into our platform." A1105:347-48. Eiss's testimony that XU had "big fans of

what we were doing[]" at IBM (XU Br. 66 (quoting A1199:567)) similarly fails to

provide a reasonable jury with a sufficient basis for finding that XU would have

successfully partnered with IBM, much less retained $70 million in value. XU also

notes (Br. 17-18) that IBM *considered* paying XU $20 million for a standstill

agreement, but IBM never actually made an offer, A1105:348-49, and XU presented

no evidence that IBM was still considering one in April when XU's application was

denied.

34

*Genesys*—XU's contention (Br. 66) that it could have partnered with Genesys is equally deficient, and unsupported by testimony from any Genesys witness. Instead, XU presents Eiss's testimony that XU still had a relationship with Genesys (*id*. (citing A1199)), and Hernandez's testimony that XU would have gone with Genesys absent a deal with Cisco (*id.*; *see also* XU Br. 15-16 (citing A1651)). But Friedman testified that XU would have had to "do a reconnect with Genesys…." A1103:338. And XU fails to explain how a reasonable jury could have inferred that, because XU had a relationship with Genesys, it would have partnered with Genesys, much less that this partnership would have succeeded and enabled XU to retain its supposed $70 million value.

XU also asserts (Br. 65-66) that, by January 2007, when the "denial" (as opposed to non-approval) of its SolutionsPlus application was disclosed, it had exhausted its resources in attempting to integrate its software with Cisco's router. But XU does not point to any evidence that these extra resources would have made it any more likely to partner successfully with CitGroup, IBM or Genesys, much less to retain its full supposed $70 million valuation. To the contrary, undisputed evidence showed that, by the spring of 2006, XU already had one foot in the grave: It was strapped for cash, *see* A11071-74; A1212:618-20, and despite operating for almost eight years, had no sales or even a finished product, A1106:352; A1200:570-71. XU does not—and cannot—explain how a reasonable jury could find that XU would have

35

successfully partnered with another company besides Cisco and maintained the $70

million value attributed to it based on the resources that it had in April 2006 when its

SolutionsPlus application was denied.

The district court correctly ruled that XU failed to present evidence sufficient to

show that any delay in disclosing the denial of its SolutionsPlus application caused it

to lose $70 million in value.

## II.    THE JUDGMENT MAY BE AFFIRMED ON THE ALTERNATIVE GROUND THAT THE JURY'S AWARD OF $70 MILLION IN LOST-VALUE DAMAGES WAS SPECULATIVE IN AMOUNT

The district court's JMOL may alternatively be affirmed on an independent

ground the district court did not reach:  Namely, that the $70 million lost-value figure

was wholly speculative.  It is a "fundamental" proposition of California law that

"damages which are speculative, remote, imaginary, contingent, or merely possible

cannot serve as a legal basis for recovery." *Piscitelli v. Friedenberg*, 87 Cal. App. 4th

953, 989 (2001) (quotation omitted).  Accordingly, it is long-settled that "damages for

the loss of prospective profits" are recoverable only "where the evidence makes

reasonably certain their occurrence and extent." *Grupe v. Glick*, 26 Cal. 2d 680, 692-

93 (1945).  Lost profits (or lost value) need not be proven with "absolute certainty,"

but a plaintiff seeking such damages must supply "some reasonable basis of

computation…." *Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 774 (2012)

(quotation omitted).  Where such a basis is absent, no lost profits may be recovered.

*See id.*; *see also Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 883 (Cal. Ct. App. 2002) (noting that this principle applies to tort as well as contract cases).

As the California Supreme Court recently emphasized, the requirement that lost profits and other damages be proven with reasonable certainty applies with special force to new or unestablished businesses like XU. *See Sargon Enters.*, 55 Cal. 4th at 774-81. Where the operation of an established business is interrupted or prevented, lost profits often "may be ascertained with reasonable certainty from the past volume of business," by "evidence of profits lost by similar businesses operating under similar circumstances," and "other provable data relevant to the probable future sales." *Id.* at 774 (quotation omitted). By contrast, where a new or unestablished business is involved, lost profits ordinarily cannot "be shown by evidence of reasonable reliability" and thus "are not recoverable for the reason that their occurrence is uncertain, contingent and speculative." *Id.* (quotation and ellipses omitted). This is especially true in the high-tech arena, where small start-ups claim, despite their lack of any track record, that their new technologies would have enjoyed spectacular growth. *Id.* at 776-79; *accord Kids' Universe*, 95 Cal. App. 4th at 887. As another court observed in connection with testimony from XU's damages expert Walter Bratic, "a start-up company should not be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate ... capitalizing fantasized earnings into a huge present value sought as damages…." *AlphaMed*

*Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1341 (S.D. Fla. 2006) (quotation omitted), *aff'd*, 294 F. App'x 501 (11th Cir. 2008).

XU did not come close to satisfying the reasonable-certainty requirement, and therefore the evidence in the record fails to support the jury's eye-popping $70 million award. Its sole evidence of lost-value damages was from Bratic, who opined that XU was worth "at least $70 million" before its SolutionsPlus application was denied in April 2006, but lost all that value by January 2007 when Cisco disclosed the denial. A1450:1224-26; A1462-64; A1467-68; A1473:1315-18. Bratic's valuation was not based on the value of similar businesses or even upon Bratic's own calculation. Instead, Bratic's valuation was based on reports prepared at XU's expense and for its benefit by Standard & Poor's and Duff & Phelps, which placed XU's value between $70 million and $225 million. A1458:1255-58, A1464:1282, A1467-68, A1473:1315-18, A1477:1322-34, A1479:1339-42; A10966-93; A10994-1019. The reports extrapolated XU's value from anticipated revenues "based on projections provided by XUI management." A10996; *see also* A11005; A11008; A11015; A11018-19; A10975; A10993; A1458:1256-57.[2] The reports, however, failed to identify the data or assumptions underlying those projections or explain how they were generated. Moreover, far from vouching for their reliability, Standard & Poor's described XU's

---

[2] Bratic noted similar projections in internal Cisco memos, A1469-70, but failed to recognize that XU gave Cisco those estimates, *see* A1627-30.

**Confidential Material Redacted**

projections as "*guesstimates*." A1478:1337; A10970 (emphasis added).  Similarly,

Duff & Phelps warned that the accuracy of its valuations was "dependent on the

achievability of the management's projections." A1480:1345; A10996.  Such

unsupported and unexplained projections cannot prove XU's revenues—and, by

extension, its value—with the reasonable certainty required by California law.

Indeed, the revenue projections in the reports were wildly unrealistic.  For

example, the Duff & Phelps report from which Bratic drew his $70 million valuation,

*see* A1458:1255-58; A1464:1282; A1473:1315-18, used projections that XU would

generate ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  A11011.  The report, however, was

issued in October 2006, by which point XU had no sales and no contract for future

sales, much less any prospect of generating ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The report likewise had no basis for projecting that XU's revenues would climb to

nearly ▮▮▮▮▮▮▮, *see* A11000; A11011, a hypothesized increase of ***more

than 30,000%*** in just four years from the already inflated 2006 projection.  Such

exponential growth would have been a startling reversal of fortune for a company

which to that point had managed only to *lose* some $28 million, A1487:1373-74.  As

the district court observed in excluding the reports themselves, these projections were

"inherently speculative." A10631.

California courts have rejected as unduly speculative far better substantiated

lost-profits/lost-value claims.  In *Parlour Enterprises, Inc. v. Kirin Group, Inc.*, 152

Cal. App. 4th 281 (2007), for example, the plaintiff claimed the profits it supposedly would have earned from opening several restaurants absent termination of a franchise agreement. Its damages expert calculated lost profits based upon projections for the restaurants from the plaintiff's chief operating officer and another employee, both of whom had extensive experience in the restaurant business. *Id.* at 289. Nevertheless, the California Court of Appeal reversed a jury award because the expert's testimony was unreliable and speculative. *Id.* at 289-90. The Court of Appeal reasoned that the plaintiff had failed to present testimony concerning the facts underlying the projections, the calculations used to generate them, or the qualifications of the individuals who made them. *Id.* XU similarly failed to present such evidence here.

Other courts also have held expert testimony concerning damages too speculative to support a damages award in such circumstances. In *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993) (applying Oklahoma law), for example, the plaintiffs asserted that the defendants prevented them from participating in a joint venture to sell fuel additives in England and presented testimony from a financial expert calculating the resulting lost profits, which was based on sales projections in a market study conducted by an economics professor and two MBAs. *Id.* at 730. Nonetheless, the Tenth Circuit held that the district court had properly directed a verdict on damages because the plaintiff's expert was unable to explain the methods or reasoning used to generate the market study's projections, thereby

40

rendering calculations based on those projections unduly speculative. *Id.* at 733. Bratic's calculations based on the unexplained and unverified projections XU supplied are even more speculative.[3]

It makes no difference that in this case Bratic purported to testify about lost *value* rather than lost *profits*. Bratic's valuation was "based on [XU's] expected future performance," A1458:1255, not on tangible assets or the price a reasonable buyer would have paid to acquire XU. The reasonable-certainty requirement is fully applicable in such circumstances. For instance, in *Kids' Universe*, 95 Cal. App. 4th 870, the plaintiff's expert testified that the business had suffered **lost profits** based on

---

[3]    This conclusion comports with numerous decisions rejecting Bratic's damages opinions as speculative and unreliable. *See, e.g.*, *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 861 (5th Cir. 2004) (reversing award of "lost asset" damages based on Bratic's "speculative lost-profit analysis"); *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 724-27 (E.D. Tex. 2011), *aff'd on other grounds*, 692 F.3d 1351 (Fed. Cir. 2012); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 WL 4065465, at*7 (S.D. Tex. Oct. 9, 2010); *Fenner Invs., Ltd. v. Hewlett-Packard Co.*, 2010 WL 3911372, at *2 (E.D. Tex. Apr. 16, 2010) (striking Bratic's damages opinions as not "reasonably reliable"); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 644 (S.D. Tex. 2008); *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 476 F. Supp. 2d 1143, 1156 (N.D. Cal. 2007) (striking Bratic's damages report as unreliable; granting summary judgment); *AlphaMed*, 432 F. Supp. 2d at 1351-352 (granting JMOL based on ruling that Bratic's lost-profits testimony was unduly speculative because of failure "to prove the factual bases on which [his] assumptions rested[]"); *Data Race, Inc. v. Lucent Techs., Inc.*, 73 F. Supp. 2d 698, 726-27 (W.D. Tex. 1999) (rejecting Bratic's testimony as for lacking sufficient evidentiary support; granting summary judgment); *Ajaxo Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1305-06 (2010) (affirming exclusion of Bratic's testimony because he provided no "reasonable basis upon which to compute E*Trade's unjust enrichment"); *Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.*, 171 S.W.3d 905, 912-16 (Tex. App. 2005).

an opinion that its "*capital value* … could have been in excess of $50 million." 95 Cal. App. 4th at 887 (emphasis added) (citation omitted). The California Court of Appeal held that testimony insufficient to establish damages with reasonable certainty, because the capital-value estimate was "unsupported" by "any analysis of [the company's] net worth." *Id.*; *see also e360 Insight v. Spaumhaus Project*, 500 F.3d 594, 602-03 (7th Cir. 2007) (requiring damages for lost value of a business based on lost-profits calculations to be proven with reasonable certainty); *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 317 (S.D.N.Y. 2008) (holding that damages based on loss in "the value of [a] business" must be "capable of proof and measurement with reasonable certainty"). XU offered no basis to distinguish these decisions below, and it cannot avoid application of the reasonable-certainty rule here. Its alleged $70 million damages were not adequately proved, and accordingly the judgment may be affirmed on this ground in addition to those on which the district court relied.

## III.   IN THE ALTERNATIVE, CISCO IS ENTITLED TO NEW TRIAL ON FRAUDULENT CONCEALMENT

If this Court were to determine that the district court erred in granting Cisco JMOL on the fraud claim (which it should not), it should vacate and remand for a new trial on any of three separate grounds:   The jury's findings of materiality and causation are against the great weight of the evidence; Bratic's unreliable expert

42

testimony was improperly admitted; and the resulting damages award exceeded what the evidence could bear.[4]

### A.    The Jury's Findings Of Materiality And Causation Are Against The Great Weight Of The Evidence

Even if a reasonable jury somehow could have found substantial evidence of materiality, causation, and $70 million in damages, the Court should order a new trial nonetheless because the jury's verdict was contrary to the great weight of the evidence.  *See, e.g.*, *Foster v. Nat'l Fuel Gas Co.*, 316 F.3d 424, 430 (3d Cir. 2003). As discussed, XU presented no evidence beyond conclusory assertions by Elizabeth Eiss that there is any material difference between denying and not approving a SolutionsPlus application, *see supra* p. 23; XU's contention that it was unaware its application was not approved is contradicted by Eiss's admission at trial, *see id.*; and XU's assertion that the denial of its application was final and precluded admission to the SolutionsPlus Program is contradicted by numerous contemporaneous documents as well as the many months that John Hernandez spent working to position XU for admission, *see supra* pp. 25-27.  Similarly, XU's assertion that it could have partnered with CitiGroup, IBM, or Genesys and retained its supposed $70 million value absent the nine-month concealment of the denial of its application is supported by only the

---

[4]    Cisco moved below for a new trial in the alternative to JMOL (*see* A3-6), and it is entitled to pursue such alternative relief as appellee without cross-appealing. *See* FED. R. CIV. P. 50(c); *id.* advisory committee's note (1963) (a party granted JMOL may "urge on the appellate court that the trial court committed error in conditionally denying the new trial … without taking a cross-appeal.").

thinnest of threads and contradicted by actual events. *See supra* pp. 33-36. Thus, even if the evidence XU presented were somehow sufficient to support a verdict, the verdict would be against the great weight of the evidence, and a new trial warranted.

Far from suggesting otherwise, the district court simply assumed that, if its JMOL ruling were reversed, "it will be because [the court] either wrongly evaluated the applicable legal standard or the sufficiency of the evidence" and therefore it could not conclude that the jury's verdict would be against the clear weight of the evidence. A5. But XU's only challenge to the legal standard applied by the district court is plainly baseless, *see supra* pp. 27-29, and it does not necessarily follow that the jury's verdict would have been supported by the weight of the evidence if there were sufficient evidence to survive JMOL. To the contrary, in deciding a motion for a new trial, unlike a JMOL, a court "can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1371 (Fed. Cir. 2009). Accordingly, reversal of a JMOL motion based on sufficiency of the evidence does not preclude ordering a new trial on the ground that the verdict is against the weight of the evidence. *See Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir. 1992).

44

**B.    The District Court Improperly Admitted Unreliable Expert Testimony On Damages**

If the liability judgment stands, a new trial on damages would still be warranted because the district court abused its discretion in admitting Bratic's testimony on XU's purported lost value.  Under governing Third Circuit law, expert testimony is admissible only if it is reliable in "all aspects," including "the facts underlying the expert's opinion…."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (quotation omitted).  *See generally Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  Accordingly, expert opinions based on unreliable data must be excluded.  *See, e.g.*, *Elcock v. Kmart Corp.*, 233 F.3d 734, 747-48 (3d Cir. 2000); *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999).  Bratic's opinions concerning XU's value fail to satisfy this requirement.

As discussed, *see supra* pp. 38-39, Bratic's opinions rested on valuation reports that were excluded from trial because they were based on unsupported and unexplained projections from XU, and the reports themselves recognized that these projections were mere "guesstimates."  A10970; A10996.  Moreover, Bratic admitted that he never analyzed the projections or attempted to verify their reliability other than by comparing them to Cisco's projections of XU's sales, which, as shown above, also were based on XU's own projections.  A1464:1282; A1627-30:1739-48; *supra* p. 38 n.2.  Thus, Bratic's valuation lacked the reliability required for admission.  *See, e.g.*, *Meteorlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004); *TK-7*, 993 F.2d at

731-33; *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc*., 350 F. Supp. 2d 582, 592, 597 (D. Del. 2004).

Moreover, because Bratic presented the only testimony that XU was worth $70 million in April 2006, it is "readily apparent" that the admission of his unreliable testimony was prejudicial. *Donlin v. Philips Lighting N. Am. Corp*., 581 F.3d 73, 83 (3d Cir. 2009).

### C.    The Jury's $70 Million Fraud Verdict Is Excessive

A new trial on damages also would be warranted because the $70 million verdict is excessive. XU was never a $70 million company. *See supra* Part II. In seven years of operation, it never had a sale, a customer, or even a finished product. *See* A1001:8; *see also supra* p. 6. XU also was in grave financial difficulty even before the denial of its SolutionsPlus application. *See supra* pp. 6-7. Nor does the evidence justify the conclusion that XU lost $70 million in value *because* Cisco told XU initially that its XU's SolutionsPlus application had not been approved. Thus, a new trial is warranted because "the evidence does not justify the amount of the award." *Stevens v. Parke, Davis & Co.*, 9 Cal. 3d 51, 61 (1973); *see also Gasperini v. Ctr. for Humanities, Inc*., 518 U.S. 415, 419, 430-31, 437-38 (1996) (holding that state law governs whether a verdict is so excessive as to warrant a new trial).

## IV.  THE DISTRICT COURT CORRECTLY REJECTED XU'S REQUEST FOR AN INSTRUCTION ON PUNITIVE DAMAGES BECAUSE HERNANDEZ WAS NOT CISCO'S "MANAGING AGENT"

Because the district court correctly granted JMOL on XU's fraudulent-concealment claim, *see supra* Part I, XU's request for punitive damages in connection with that claim is moot.  If reached, XU's challenge to the district court's refusal to instruct the jury on punitive damages should be rejected.  Under California law, punitive damages may be imposed on a corporation based on an employee's conduct only if the employee was "an officer, director, or managing agent of the corporation." CAL. CIV. CODE § 3294(b).  XU contended below that Hernandez was a Cisco managing agent because of his role at CCBU, but the district court correctly rejected that argument and declined to instruct the jury on punitive damages.  A1752-53.  XU fails to show any error in that ruling.

The California Supreme Court has construed a "managing agent of the corporation" to be a corporate representative who, like an officer or director, "exercises substantial discretionary authority over decisions that ultimately determine corporate policy."  *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 573 (1999).  The mere exercise of some supervisory duties is insufficient:  to be a managing agent, an employee "must be in a corporate policymaking position."  *Myers v. Trendwest Resorts, Inc.*, 148 Cal. App. 4th 1403, 1437 (2007).  Indeed, to qualify as a managing agent, an employee must wield authority over policies that affect "a substantial

47

portion of the company" and are "likely to come to the attention of corporate leadership." *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 715 ( 2009). Moreover, an employee must be proven to be a "managing agent" by clear and convincing evidence. *See Barton v. Alexander Hamilton Life Ins. Co. of Am.*, 110 Cal. App. 4th 1640, 1644 (2003).

XU did not even begin to satisfy this exacting standard. Its primary argument (Br. 46, 68) is that "Hernandez was Director, Product Manager, CCBU" and responsible for developing and marketing all CCBU products. But XU failed to present evidence that CCBU was anything more than one of many business units in a large corporation. *See* A1752:2035. XU also failed to show that Hernandez exercised substantial discretionary authority within CCBU. *See* A1753:2036. To the contrary, uncontroverted evidence showed that Hernandez reported to CCBU general manager Philonenko, and that Philonenko in turn reported to Don Proctor, the senior vice-present of communications products, A1618:1701-02, placing Hernandez at least three levels down in that area. Cisco presented undisputed testimony that Philonenko, not Hernandez, had the authority to "look at the broader side of things" and that Philonenko would "hand" particular projects to Hernandez "to execute." A1624:1725. Plainly, Hernandez did not "belong[] to the leadership group of officers, directors and managing agents" or exercise managing agent-level discretion. *Cruz v. HomeBase*, 83 Cal. App. 4th 160, 167-68 (2000) (quotation omitted).

48

XU asserts (Br. 68) that Hernandez had authority to decide whether to "reapply for SolutionsPlus."  XU fails, however, to explain how discretion to submit applications for a partnering program such as SolutionsPlus qualifies as authority over polices affecting "a substantial portion of the company" or why such applications are "likely to come to the attention of corporate leadership."  *Roby*, 47 Cal 4th at 715. Nor did XU show that Hernandez had discretion to submit SolutionsPlus applications. To the contrary, e-mails from May 2006 show that, when questioned how CCBU would respond to the denial of XU's SolutionsPlus application, Hernandez had to "circle back with Laurent [Philonenko]" before deciding what to do.  A10949.  And undisputed evidence established that the Governance Council, not Hernandez, had authority to admit a product into SolutionsPlus.  *See* A1615-22.  Finally, XU's allegations (Br. 46-47, 68-69) about Hernandez's supposed role in organizing a conspiracy have nothing to do with the question whether he belongs to the leadership group. The district court did not err in declining to instruct the jury on XU's request for punitive damages.

## V.    THE DISTRICT COURT CORRECTLY ENTERED SUMMARY JUDGMENT FOR CISCO ON XU'S TRADE-SECRET AND CONTRACT CLAIMS

XU's remaining assignments of error, which challenge the district court's grants of summary judgment on XU's trade-secrets and contract claims, are without merit.

### A.    XU Raises No Genuine Issue With Respect To Its Trade-Secrets Claim

XU does not contest the district court's ruling that XU failed to identify with sufficient specificity 44 claimed trade secrets, A60-61. It challenges the court's rulings concerning the two purported secrets (numbers 18 and 33) that the court found adequately described, A61, using color-coded flowcharts to compare Cisco's Remote Expert and Expert Advisor products with the "architecture diagram" for those trade secrets in an attempt to show that Cisco used those trade secrets in its products. *See* XU Br. 34-37, 49, 69-70. This argument fails for three independent reasons.

### 1.    XU's Misappropriation Theory Is Waived

XU waived its misappropriation argument by not raising it below. "[A] party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal." *Ray v. Pinnacle Health Hospitals, Inc.*, 416 F. App'x 157, 162 (3d Cir. 2010) (quotation omitted); *accord Lesendre*, 2014 WL 1924726, at *7.

XU's opposition brief in the district court (A6026-75) did not make the color-coded comparisons on which it now relies. Nor did XU argue that Cisco's products embody misappropriated trade secrets based on the six-point summary of shared elements it now derives (Br. 37, 70) from that comparison. Instead, XU argued that it had raised genuine issues based upon a report and an affidavit from an expert, neither

50

of which compared diagrams or summarized the features of XU's claimed secrets. *See* A62; A64-65; A6057-59; A6046-48; A5563-699; A5985-6025.  Indeed, XU's district-court brief did not discuss *either* its "architecture diagram" *or* Cisco's flowcharts in connection with the trade-secrets claim, let alone compare the two.  And in oral argument, XU's counsel *admitted* that XU "didn't" "go through and explain what every little box in every one of those diagrams relates to, or how it relates to the trade secret [or confidential information]."  A10678; *see generally* A10678-82.  XU cannot now fault the district court for failing to perform this comparison *sua sponte*. As this Court has observed, "Judges are not like pigs, hunting for truffles buried in briefs."  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250 n.2 (Fed. Cir. 2008) (quotation omitted).

### 2.    XU's Diagram Comparisons Do Not Raise A Genuine Issue As To Whether Cisco Used Trade-Secret Information

In addition to being waived, XU's argument fails to show that Cisco used any purported trade secrets.   California trade-secret law protects only specific "*information*," CAL. CIV. CODE § 3426.1(d) (emphasis added), not mere "features, functions, [or] characteristics," *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 221 (2010), *disapproved on other grounds*, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011).  As the California Court of Appeal has explained, "[t]rade secrets law does not protect ideas as such…." *Id*. at 220.  A trade secret is "something we would not ordinarily consider an *idea* (a conceptual datum) at all, but more a *fact* (an

51

empirical datum), such as a customer's preferences, or the location of a mineral deposit." *Id.* at 220-21. Thus, "the trade secret is not the idea or fact itself, but *information* tending to communicate (disclose) the idea or fact to another." *Id.*

As the district court recognized, A61 & A61 n.5, the only arguably specific information concerning how XU's general ideas work is in the "architecture diagram" referenced in XU's trade-secret descriptions:



*Confidential Material Redacted*

A6077.    This diagram identifies the particular elements of XU's proposed

██████████████████████████████████████████████████████

A5899, and the steps by which XU's product would execute ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████.  In particular, the diagram ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

XU's color-coded comparison fails to show that any of this specific information

is included in Cisco's products.  Although XU argues that the comparison shows

certain shared features,[5] those features are described at such a high level of generality

that they do not contain any specific information that could constitute a trade secret.

Broad concepts such as a ███████████████████████████████████████████████

---

[5]    As set out in XU's brief: ███████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████  XU Br. 37, 70.

*Confidential Material Redacted*

███████████████████████████████████████████████████

██████████████████████████████████████████████ could

not even arguably be described as trade-secret information.

Nor do Cisco's flowcharts suggest otherwise. Those charts are so high-level

that they fail to specify any technologies, particular processes, or other specific

information that could qualify as a trade secret. Instead, they indicate only the most

general functions such as █████████████████████████████████████

████████ and "████████████████████

**Remote Expert**



*Confidential Material Redacted*

**Expert Advisor**



XU Br. 35-36 (citing A5397, A5704).

Nor does XU's color-coded diagram of its product suggest that Cisco's products use any protectable trade secrets.  To the contrary, virtually all of the specific, potentially protected information in XU's diagram falls *outside* the color-coded areas of alleged similarity:

*Confidential Material Redacted*

**XpertUniverse**



**Confidential Material Redacted**

XU Br. 34 (citing A6077). Thus, even if properly before this Court, XU's diagrams would show only that its product shares general concepts and functions with Cisco's products and thus would not raise any genuine issue concerning misappropriation of protectable trade-secret information.

XU suggests without elaboration (Br. 73) that its trade secret lies in a means of

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ That argument is doubly waived: XU did not raise it below, and it is now presented in too cursory a fashion to supply a basis for reversal. *See supra* p. 30; *Halliburton*, 514 F.3d at 1250 n.2. In any event, XU makes no attempt to show that either Expert Advisor or Remote Expert embodies this technique.

Equally meritless is XU's challenge (Br. 49-51, 71-72) to the district court's reliance on "undisputed evidence" that Cisco "developed [its projects] without the use of any XU trade secrets," A62. XU's unsupported assertions notwithstanding, the summary-judgment record established that none of XU's purported trade secrets "w[ere] ever used or discussed as a basis for functionality in Expert Advisor," A5879, and that Remote Expert was likewise developed without using information from XU, *see, e.g.*, A5863-64; A62. XU criticizes this undisputed evidence as "conclusory" (Br. 72), but it is more than sufficient to carry Cisco's burden of production and thus to

shift onto XU the burden of presenting contrary evidence of use. *See, e.g.*, *Berkeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *see also TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004) ("Summary judgment should not be denied simply because the opposing party asserts that the movant's witnesses are not to be believed."). XU has not carried that burden.

Nor, contrary to XU's suggestion (Br. 49, 71), is there any inconsistency between the district court's ruling that XU raised a genuine issue concerning Cisco's purported use of trade-secret information in a single patent application and its ruling that XU failed to raise such an issue concerning use of that information in its products. Cisco's patent application is far more specific than its product flowcharts, providing detail from which a jury arguably could find disclosure of confidential information. *See* A11163-78. In addition, the district court's ruling concerning Cisco's patent application was based on expert testimony that information in XU's architecture diagram was disclosed in the application. A65. By contrast, XU's expert did "not identify any of the information in the cited diagrams 'embodied in any Cisco project.'" A62.

XU's district-court cases (Br. 70, 72) do not change the result, because in both the plaintiffs proffered direct evidence of misappropriation. In *Spring Design, Inc. v. Barnesandnoble.com, LLC*, 2010 WL 5422556 (N.D. Cal. Dec. 27, 2010), the plaintiff submitted both expert testimony that the defendant did not independently develop its

58

*Confidential Material Redacted*

product and fact testimony that the claimed trade secrets had been incorporated into the defendant's device. *Id.* at *7. Similarly, in *Think Village-Kiwi, LLC v. Adobe Sys., Inc.*, 2009 WL 3837270, at *3-4 (N.D. Cal. Nov. 16, 2009), the plaintiff submitted substantial evidence controverting the defendant's denial that it misappropriated trade secrets. XU has submitted no such proof.

### 3.    There Is No Genuine Issue As To Whether XU's Claimed Trade Secrets Were Widely Known

XU's trade-secret claim fails for the additional reason (not reached below) that neither of XU's claimed trade secrets meets the element of "not being generally known to the public or to other persons who can obtain economic value from its disclosure or use[,]" CAL. CIV. CODE § 3426.1(d)(1). Although XU's expert distinguished certain of XU's purported trade secrets from two other products, ███████████████████████████████ he did not discuss trade secrets 18 and 33, the two at issue on appeal. A5585-89. Moreover, Cisco presented unrebutted evidence that both trade secrets were anticipated not only by ████████████████ ██████████████████████████████████████████████████████████████ A10550-54; A10589-91. Thus, XU failed to raise a genuine issue regarding whether either purported trade secret was not generally known. The district court's entry of summary judgment should be affirmed.

### B.     XU Fails To Raise A Genuine Issue With Respect To Its Breach-Of-Contract Claim

Like its trade-secret claim, XU's contract argument on appeal is limited to a small fraction of its pleadings:  The district court granted summary judgment as to most of XU's breach theories, A64-65, and declined to instruct the jury as to the remainder, A1029-30:83-87; XU Br. 49 n.6, but XU appeals only with respect to the material covered by its trade secrets, which it says the parties' NDA also protects. XU's argument fails.

*First*, XU's argument is waived.  Although XU observes (Br. 51-52) that it "cited its architecture diagram … and Exhibit 107" in the district court, it asserted only that unspecified "content from numerous XU documents marked Confidential pursuant to *every* NDA can be found directly in [unspecified] Cisco[] products[]," A6048.  Such a generalized assertion did not compel the district court to perform the element-by-element comparison that XU now contends was necessary.  *See Halliburton*, 514 F.3d at 1250 n.2.

*Second*, XU has not shown that Cisco used any information whose disclosure would breach the NDA.  It points to the same material purportedly covered by its alleged trade secrets, which, as just shown, is highly generalized and well known.

*Third*, XU has never identified evidence of cognizable contract damages.  XU cited no such evidence at summary judgment, *see* A6048, and it never later developed competent evidence of damages resulting from disclosure of its purported confidential

information in Cisco's patent application—the same "confidential information" involved here, *see* A10831-34; A1029-30; XU Br. 49 n.6.  It is thus unsurprising that XU identifies no evidence of contract damages in its appellate brief.

## CONCLUSION

The judgment should be affirmed.


Dated: May 22, 2014                                    Respectfully submitted,

                                                       /s/ Kathleen M. Sullivan
Brett M. Schuman                                       Kathleen M. Sullivan
MORGAN, LEWIS & BOCKIUS LLP                            Cleland B. Welton II
One Market Street, Spear Street Tower                  QUINN EMANUEL URQUHART &
San Francisco, CA 94105                                  SULLIVAN, LLP
(415) 442-1000                                         51 Madison Avenue, 22nd Floor
                                                       New York, NY 10010
Kell M. Damsgaard                                      (212) 849-7000
MORGAN, LEWIS & BOCKIUS LLP                            kathleensullivan@quinnemanuel.com
1701 Market Street
Philadelphia, PA 19103                                 Daniel H. Bromberg
(215) 963-5000                                         QUINN EMANUEL URQUHART &
                                                         SULLIVAN, LLP
                                                       555 Twin Dolphin Drive, 5th Floor
                                                       Redwood Shores, CA 94065
                                                       (650) 801-5000


*Attorneys for Defendant-Appellee Cisco Systems, Inc.*

# United States Court of Appeals
## for the Federal Circuit
*XpertUniverse Inc. v. Cisco Systems, Inc.,* 2013-1565

## PROOF OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by QUINN EMANUEL URQUHART & SULLIVAN, LLP, attorneys for Appellee, to print this document. I am an employee of Counsel Press.

On **May 22, 2014,** counsel has authorized me to electronically file the foregoing **Brief for Defendant-Appellee (confidential and non-confidential)** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Donald R. Dunner
Allen M. Sokal
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
 (202) 408-4000
don.dunner@finnegan.com
sokal@finnegan.com
*Counsel for Plaintiff-Appellant XpertUniverse Inc.*

By agreement between the parties, the brief will also be served today via email with confidential paper copies being mailed to the above counsel at the time paper copies are sent to the Court.

62

Upon acceptance by the Court of the e-filed document, six confidential paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

May 22, 2104                                                          /s/ John C. Kruesi, Jr.
                                                                     Counsel Press

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing Brief For Defendant-Appellee complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(b). The brief was printed using a 14 point Times New Roman font.  The word-processing system used to prepare the document, excluding the Table of Contents, Table of Authorities, and Certificate of Interest, calculates that it contains 13,411 words.


/s/ Kathleen M. Sullivan
Kathleen M. Sullivan